UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 4:19CR40018 SOH |
| | ) | |
| LONNIE JOSEPH PARKER | ) | |

**THE UNITED STATES OF AMERICA'S**
**NOTICE OF INTENT TO OFFER RULE 404(b) EVIDENCE AND**
**MOTION FOR ADMISSION OF EVIDENCE UNDER 404(b)**

The United States of America, by David Clay Fowlkes, First Assistant United States Attorney for the Western District of Arkansas, and Special Assistant United States Attorney Anne E. Gardner, submits the following response in to defendant's motion for disclosure of F.R.E. 404(b) evidence (*Doc. No. 37*).

## I.    ISSUE AND RELIEF

The United States herein provides notice of its intent to seek the admission the following evidence under Federal Rules of Evidence, Rule 404(b) (Rule 404(b)) as evidence of intent, knowledge, and absence of mistake: a) additional prescriptions issued to defendant's patients whose prescriptions are charged in Counts 1 through 9 of the Superseding Indictment, b) testimony from defendant's patients who are not covered in Counts 1 through 9 of the Superseding Indictment, and c) practice-wide evidence that during the timeframe charged in the Superseding Indictment, defendant issued certain kinds of prescriptions in enormous quantities and dangerous combinations outside the standard of medical practice generally recognized and accepted in the country.

Because the admission of Rule 404(b) evidence described herein is dispositive to the United States' case, the United States respectfully requests a pre-trial ruling on its admission well

1

in advance of trial, so that the matters can be fully litigated before the January 19, 2021 trial date.

## II. BACKGROUND

Beginning in 2018, Dr. Lonnie Joseph PARKER (PARKER), a licensed physician, opened a primary care clinic at 502 E. 24th Street, Texarkana, Arkansas. In November 2018, Drug Enforcement Administration (DEA) personnel received complaints from local law enforcement that PARKER was operating a "pill mill" under the name Primary Care Specialists from his clinic at 502 E. 24th Street, Texarkana, Arkansas. The complaints stated that PARKER was over-prescribing narcotics to patients, that he was only accepting cash payments, and that one of PARKER's patients, "NC," who had been prescribed multiple pain medications by PARKER, had died of a fatal overdose in Plano, Texas.

During the investigation, DEA interviewed several patients from PARKER's clinic including the following: On February 8, 2019, investigators interviewed "CN," a friend of NC and former patient of PARKER. CN stated that he had ceased seeing PARKER after NC's death. CN's new physician was surprised at the level of narcotics he had been receiving from PARKER and lowered his opioid dosages significantly. CN described his experience at PARKER's clinic, explaining that PARKER saw as many patients as fast as he could, and you "show up, get your drugs, and leave." According to CN, it was common for appointments to take place in the hallway with no vital signs being taken. CN admitted to investigators that he believed the clinic was a "pill mill," but he needed his medication, so he continued to be seen there. CN requested PARKER switch him to an extended release pain medication, but PARKER declined and increased his hydrocodone dosage to approximately seven (7) tablets per day, which CN described as "too much". CN also stated that he questioned PARKER about alternative therapies, but PARKER appeared annoyed with the suggestion. When questioned about his relationship with NC, he stated

that after taking his prescribed medications, NC would "walk around like a zombie" and had even fallen asleep while smoking and burned his arm. Following NC's death, CN stated that he confronted PARKER about prescribing "horse tranquilizers and oxy" to NC. According to CN, this upset PARKER, and CN was escorted out of the clinic by an individual who he believed was the office manager. Thereafter, CN was discharged from PARKER's care.

In June 2019, Investigators interviewed a former patient of PARKER identified as "TH". TH told investigators that PARKER was known around town as "Dr. Feelgood," and that the majority of his patients appeared to be the type of people that would sell or abuse their prescriptions. TH stated that it was not uncommon to witness people talking about sharing and buying each other's prescription medication, and TH was approached in the parking lot of PARKER's clinic and offered between $300 and $500 dollars to sell her prescription. Furthermore, TH stated that she routinely tested positive for marijuana use, but was never confronted by PARKER about it. TH stated that if a patient could not urinate for a drug screen, the patient would still receive his or her prescription. After PARKER's clinic became a "cash only" clinic, TH could not afford to be seen there, so she went to a different clinic. At the first visit at the new clinic, TH was asked by the physician if she knew she was "about to die," because the combination of medications she was prescribed, along with her existing medical conditions, was a "lethal combination."

Former patient, "JS", was interviewed by investigators in June 2019. JS told investigators that he never received a physical examination from PARKER, and after just speaking to PARKER he was given his prescriptions. JS also stated that most of the patients at PARKER's clinic appeared to be "dope fiends."

During the investigation, DEA reviewed and analyzed data from the Arkansas Electronic

Prescription Monitoring Program (PMP). The PMP was authorized in 2011 by Arkansas State Legislature Act 304. The Arkansas Department of Health (ADH) oversees the operation of the PMP which is a database that collects and stores prescribing and dispensing data for controlled substances in Schedules II, III, IV, and V and any other drugs specified by Arkansas law as amended. Arkansas law requires that each dispenser of controlled substances shall submit, by electronic means, information regarding each controlled substance prescription dispensed to an individual in a timely fashion. The collection of data began March 1, 2013, and the data is maintained indefinitely. The following data is captured by the PMP:

- Patient's First and Last name
- Patient's address including City, State and Zip Code
- Patient's DOB
- Dispending Pharmacy's DEA number
- Dispending Pharmacy's name
- Dispensing Pharmacy's address including City, State and Zip Code
- Dispensing Pharmacy's Store ID number
- Date prescription was written
- Date prescription was filled
- Name of dispensed controlled substance
- Prescription number
- Schedule of controlled substance dispensed
- How many refills are available
- Drug category (Sedative, Narcotic etc.)
- Payment type (Private Pay, Medicare, Comm Insurance, Other)

- Quantity Dispensed

- Units dispensed (ml, mg)

- Number of Days of Supply

- MME[1]'s per day

- Prescriber's DEA number

- Prescriber's First and Last name

- Prescriber's address including City, State and Zip Code

The PMP maintains procedures to ensure that the privacy, confidentiality, and security of patient information collected, recorded, transmitted, and maintained is not disclosed except as provided in Act 304. In 2015, Act 304 was amended to provide access to prescription data without a search warrant as part of an authorized investigation to certified law enforcement prescription drug diversion investigators of qualified law enforcement agencies.

In this case, an analysis of PMP data for approximately a two-year period and found that PARKER prescribed 1,278,410 dosage units of Schedule II Controlled Substances to a total of 1,508 patients (approximately 847 dosage units per patient), including 373,094 dosage units of oxycodone products and 784,921 dosage units of hydrocodone products. PARKER also prescribed 62,486 milliliters of Promethazine with Codeine syrup to twenty-nine patients during the time-period. The top medications prescribed by PARKER in his general practice were Hydrocodone Bitartrate/acetaminophen, Oxycodone HCl, and Alprazolam.

An analysis of PARKER's prescribing in comparison to other physicians in PARKER's medical specialty (general practice) showed the following:

---

[1] MME means daily Morphine Milligram Equivalent

**Number of Patients Receiving Opioids (monthly average)**
PARKER: 545//Similar Prescriber (SP)[2]:19

**Number of Prescriptions Written for Opioids (monthly average)**
PARKER: 828 // SP: 23

**Opioid Treatment Duration over 90 days (% of patients)**
PARKER: 65.30% // SP: 35.91%

**Prescriptions Volumes (Total MMEs, Monthly Average)**
Oxycodone: PARKER: 552,226 // SP: 299
Hydrocodone: PARKER 388,504 // SP: 2,526

**Anxiolytic/Sedative/Hypnotic Prescribing (monthly average)**
Number of Rx: PARKER 225 // SP: 21
Number of Dosage Units: PARKER 11,289 // SP: 1,230

On October 4, 2019, the Grand Jury for the Western District of Arkansas charged PARKER with nine counts of distribution of a controlled substance without an effective prescription. Each of the counts relates to a prescription issued to a particular patient seen in PARKER's practice.

### III. LEGAL ANALYSIS AND DISCUSSION

*A. Distribution of a Controlled Substance without an Effective Prescription*

To convict a medical practitioner of distribution of a controlled substance without an effective prescription, the government must prove, "1) That the defendant distributed a controlled substance, 2) That the defendant acted intentionally or knowingly, and 3) That defendant prescribed the drug without a legitimate medical purpose and outside the course of professional practice." *United States v. Chaney,* 921 F.3d 572, 589 (6th Cir. 2015) (quoting, *United States v. Johnson,* 71 F.3d 539, 542 (6th Cir. 1995) (internal citation omitted)).

*B. Burden of Proof*

The United States must prove beyond a reasonable doubt that a defendant violated the statute charged. "In the medical context, drug distribution in violation of [21, United States Code,

---

[2] Similar Prescriber (SP) in this case means a physician in general practice.

Section] 841(a)(1) requires proof either, '1) the prescription was not for a legitimate medical purpose' *or* 2) the prescription was not made in the 'usual course of professional practice'". *United States v. Ruan*, 966 F.3d 1101, 1136 (11th Cir. 2020) (quoting, *United states v. Joseph*, 709 F.3d 1082, 1102 (11th Cir. 2013) (internal citation omitted)); see also *United States v. Nelson*, 383 F.3d 1227, 1233 (10th Cir. 2004) (the standard is whether the United States has proven beyond a reasonable doubt that the defendant, in distributing the controlled substance, acted "without a legitimate medical purpose *or* outside the usual course of professional practice."). Where courts have instructed that the jury must find a defendant prescribed the drug other than for a legitimate medical purpose *and* not in the usual course of medical practice, this instruction has been acknowledged to exceed the standard required by *United States v. Moore*, which is whether the practitioner was acting "outside the course of [professional] practice." *See United States v. McIver*, 470 F.3d 550, 558-59 (4th Cir. 2006) (citing, *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994)); *United States v. Alerre*, 430 F.3d 681, 690-91 (4th Cir. 2005); *United States v. Moore*, 423 U.S. 122, 139, 96 S. Ct. 335 (1975).

In meeting its burden of proof, the United States may present "standard of care" evidence showing that a practitioner contravened a civil standard. *See McIver*, 470 F.3d at 559. As explained in *Alerre*,

> "[E]vidence that a physician's performance has consistently departed from accepted professional standards supports the proposition that the physician was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice. As a result, such evidence may properly be relevant to establish that the physician contravened the criminal standard of liability."

*Alerre,* 430 F.3d at 691 (citing, *Tran Trong Cuong*, 18 F.3d at 1138-40). To assure a jury is instructed with the correct criminal standard, a good faith instruction can be given, which is not proper in civil cases. *See United States v. Smith*, 573 F.3d 639, 650-51 (8th Cir. 2009) (explaining,

7

"[t]he court also allowed Smith the possibility of a good-faith defense, which is unavailable in malpractice cases."). Whether a medical practitioner acted in good faith is measured by an objective standard, that is, whether the medical practitioner was acting in "the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *United States v. Hurwitz*, 459 F.3d. 463, 476 (4th Cir. 2006) (quoting, *United States v. Moore*, 423 U.S. 122, 139, 96 S. Ct. 335 (1975)); *see, United States v. Joseph*, 709 F.3d 1082, 1097 (11th Cir. 2013) (whether a defendant acts in the usual course of her professional practice must be evaluated on an objective standard, not a subjective standard); *United States v. Smith*, 573 F.3d at 648 (the appropriate standard of what constitutes a doctor's "professional practice" is an objective one); *United States v. Wexler*, 522 F.3d 194, 205-06 (2d Cir. 2008) ("good-intentions" component not required in otherwise sufficient good faith instruction); *United States v. Hayes*, 794 F.2d, 1348, 1351 (9th Cir. 1986) (affirming conviction where district court instructed that '[g]ood faith is not merely a doctor's sincere intention towards the people who come to see him, but, rather, it involves his sincerity in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country"); *United States v. Vamos*, 797 F.2d 1146, 1153 (2d Cir. 1986) (explaining, "[t]o permit a practitioner to substitute his or her views of what is good medical practice for standards generally recognized and accepted in the United States would be to weaken the enforcement of our drug laws in a critical area.").

    C.    *Rule 404(b)*

"Rule 404(b) provides that evidence of prior crimes or acts, while inadmissible to prove that a person acted in conformity with the prior act, may be admissible for other purposes, such as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

or accident.'" *United States v. Katz*, 445 F.3d 1023, 1029 (8th Cir. 2006) (quoting, *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006) (internal citation omitted)). "Evidence is admissible under Rule 404(b) if it is (1) relevant to a material issue, (2) similar in kind and close in time to the crime charged, (3) proven by a preponderance of the evidence, and (4) if the potential prejudice does not substantially outweigh its probative value." *Id.* Rule 404(b) is a rule of inclusion, and "the district court has broad discretion in admitting such evidence and will be reversed only if 'such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *Id.* (quoting, *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006)); *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020).

The admission of similar prescription evidence under Rule 404(b) was addressed by the Eighth Circuit in *United States v. Jones*, 570 F.2d 765 (8th Cir. 1978), and *United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006). Most recently, the admission of such evidence under 404(b) was addressed by the Ninth Circuit in *United States v. Lague*, 971 F.3d 1032 (9th Cir. 2020), and the Third Circuit in *United States v. Li*, 819 Fed.Appx. 111 (3d Cir. 2020).

### 1. United States v. Jones

In *United States v. Jones*, Dr. Jones, the defendant, was charged with two counts of prescribing Quaalude without a legitimate medical purpose and outside the usual course of professional practice. *See United States v. Jones*, 570 F.2d 765, 766 (8th Cir. 1978). The charges arose from the issuance of two prescriptions to undercover officers posing as patients in Dr. Jones' office. As part of the proof, the United States offered 478 prescriptions for Schedule II controlled substances written by Dr. Jones to various patients over a period of twenty months. This evidence was submitted in conjunction with testimony from officers that thirteen of Dr. Jones' patients were known intravenous drug users. The Eighth Circuit found that this evidence was improperly

9

admitted under 404(b) explaining, "[a]bsent any evidence bearing upon Dr. Jones' treatment of patients in question, issuance of the prescriptions without more does not show that Dr. Jones acted unprofessionally in issuing these prescriptions." *Id.* at 768. The Court held further that under F.R.E. 403, "[t]he evidence lacked substantial probative force upon the issue of improper medical practice in the transactions charged, yet it could have led the jury to speculate that the quantity of prescriptions alone established wrongful conduct by Dr. Jones." *Id.* at 769.

### 2. United States v. Katz

In *United States v. Katz*, the defendant, Dr. Katz, was charged with 192 counts of issuing prescriptions to 15 patients outside the course of professional practice and not for a legitimate medical purpose. *United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006). The charges arose from an investigation of Dr. Katz's practice, where he saw patients without an appointment seven days a week, charging a cash fee of $40 or $45 dollars. Three undercover officers testified that they obtained prescriptions by visiting Dr. Katz and requesting certain medications. The remaining patients testified about obtaining prescriptions on demand from Dr. Katz over the course of their patient relationship with Dr. Katz. Expert testimony following the review of four patient files was offered to support Dr. Katz's prescribing practices being outside the scope of legitimate medical practice and without legitimate medical purpose. In addition, the United States admitted, as 404(b) evidence of knowledge and intent, approximately 300 prescriptions written for patients who were the subject of counts in the indictment, but which were not specifically charged in the indictment. *Id.* at 1029. The Eighth Circuit found no abuse of discretion in the admission of the 300 prescriptions as Rule 404(b) evidence. *Id.* The Court explained that the prescriptions were admissible to prove intent explaining, "the question of Dr. Katz's intent was central to the case and relevant to a material issue." *Id.* Further, "the prescriptions not charged in the indictment were

similar in kind and close in time to the crime charged," . . . "the prescriptions not charged in the indictment were proven by a preponderance of the evidence," . . . and "the admission of the prescriptions was not unfairly prejudicial." *Id.* (citing, *United States v. Green*, 428 F.3d 1131, 1134 (8th Cir. 2005)).

At trial, the United States offered the testimony of a patient whose prescriptions were not included in the 192 counts. *Id.* at 1030. The Eighth Circuit found the testimony admissible under the four-factor test for admission of Rule 404(b) evidence, explaining that there was no abuse of discretion in the district court's admission of the testimony, as it was "admitted to show Dr. Katz's knowledge and intent in writing [the charged] prescriptions in order to establish that he did not have a legitimate medical purpose in writing them." *Id.*

### 3. United States v. Li

In July 2020, the Third Circuit issued an opinion in *United States v. Li* that testimony of pharmacists and patients not specifically identified and charged in the indictment was properly admitted as intrinsic evidence, rather than Rule 404(b) evidence. *United States v. Li*, 819 Fed.Appx. 111 (3d Cir. 2020). In *Li*, the defendant, Dr. Li, was charged with unlawful distribution of controlled substances, distribution to a pregnant woman, distribution resolving in death, and maintaining a drug-involved premises, as well as money laundering and tax evasion. Dr. Li ran a neurology and pain management medical practice in Pennsylvania. By 2013, Dr. Li, was one of the highest volume prescribers of oxycodone and other controlled substances in Pennsylvania. The investigation revealed that Dr. Li required cash payments from patients, conducted brief and superficial medical exams, prescribed high dosages of oxycodone without proper medical necessity or patient documentation, wrote higher dosage prescriptions at patients' requests, increased dosages to patients with stable conditions, continued writing prescriptions to patients

who were clearly abusing their medications, and billed insurers for tests that were not performed. *Li* at 114. At trial, pharmacists testified that they refused to fill prescriptions, as Dr. Li's patients exhibited "textbook red flags" that the prescriptions should not be filled. These red flags included prescriptions written for large quantities at the maximum dosage, patients unwilling to present identification, patients traveling long distances to obtain the prescriptions, and paying in cash. *Id.* The United States also offered testimony from the family of the deceased patient and expert testimony as to Dr. Li's prescribing practices in 37 patient files. *Id.* at 115. The Third Circuit found that testimony of the pharmacists and patients who did not have specific charges in the indictment was admissible as intrinsic evidence, as it was proof of the ultimate issue in the case. *Li* at 116. The court explained, "[t]here is no question that the testimony was introduced for a non-propensity purpose. The Government used the pharmacists' testimony that they had repeatedly called Li to question his prescriptions to show he knew he was prescribing pills outside the course of professional practice." *Id.* at 116-17. The court explained that patients' testimony was offered to prove that Dr. Li maintained a drug-involved premises, however the court did not explain whether the patient testimony was also intrinsic to the unlawful distribution counts. *Id.* at 117. The court explained, however, that the patients' testimony "demonstrated that Li acted more like a drug dealer – creating and feeding additions – than a pain management doctor. This was not Rule 404(b) evidence, and the District Court properly admitted it." *Id.* The Third Circuit also noted that evidence of patients' addictions, withdrawal symptoms, and criminal actions was not unfairly prejudicial and was "relevant to show that [Li's] treatment was outside the course of professional practice." *Id.*

### 4. United States v. Lague

In August 2020, the Ninth Circuit in *United States v. Lague* considered whether practice-

wide prescription data offered against a doctor charged with unlawful distribution of a controlled substance was admissible under Rule 404(b). *See United States v. Lague*, 971 F.3d 1032 (9th Cir. 2020). In *Lague*, the defendant, a Physician's Assistant authorized to issue prescriptions, was charged with 39 counts of unlawfully distributing controlled substances to five patients. *Lague* at 1035. In 2016, one of Lague's patients was arrested for distribution of oxycodone he had obtained through a prescription from Lague. The patient agreed to work as an informant and obtained audio video evidence against Lague. In 2017, a search warrant was executed at Lague's office, where 150 patient files were seized. Based on the recordings and the patient files, charges were brought against Lague. At trial, the United States presented evidence that Lague prescribed enormous quantities of controlled substances in dangerous combinations to the five patients covered by the indictment. The United States also admitted the patient files of these five patients, and two former patients testified at trial. In addition to patient-specific evidence, the United States introduced Lague's practice-wide prescription data from 2015 and 2016 to show how Lague's prescription levels compared to that of other opioid prescribers. The data concerned 458 patients unrelated to the indictment and showed that Lague had prescribed opioids at among the highest rates of other pain management prescribers in California. Two statistical experts testified that Lague's prescription data "made him an outlier" in the medical field, and that his he was operating outside the usual course of professional practice and without a legitimate medical purpose. *Id.* at 1036-38.

The admission of the patient related evidence was not challenged. The Ninth Circuit considered whether the practice-wide prescription date not relating to patients in the indictment was admissible as Rule 404(b) evidence of intent. *Id.* at 1038. The court explained that "the material fact at issue" was whether Lague intended to prescribe controlled substances to the five patients covered by the indictment, and if Lague's aberrational prescription data is probative of his

13

intent to prescribe the uncharged prescriptions without a legitimate medical purpose, there is a logical connection between the "other" prescriptions and the prescriptions charged in the indictment. *Id.* at 1038. In determining whether practice-wide prescription data is probative of unlawful intent, the Ninth Circuit considered the Eleventh Circuit's decision in *United States v. Merrill*, 513 F.3d 1293 (11th Cir. 2008) and the Eighth Circuit's decision in *United States v. Jones*, 570 F.2d 765 (8th Cir. 1978). In *Merrill*, the Eleventh Circuit explained that "evidence of the quantity and combination of prescriptions . . . was directly related to [whether he was] relieved of liability under the Controlled Substances Act because he acted in the 'usual course of professional practice.'" *Lague* at 1039 (quoting, *Merrill*, 513 F.3d at 1303). "This was because a 'jury may consider prescription data sets outside those specifically charged in the indictment to determine whether a physician has exceeded the legitimate bounds of medical practice.'" *Id.* (quoting, *Merrill*, 513 F.3d at 1303); *see also, United States v. Harrison*, 651 F.2d 353, 355 (5th Cir. 1981). In *Jones*, the Eighth Circuit held that without specific evidence of the doctor-patient relationship or other proof that the uncharged prescriptions had not been issued for a proper medical purpose, the quantity of the uncharged prescriptions was not probative of whether the physician had "acted unprofessionally." *Lague* at 1039.

The Ninth Circuit found the decisions in *Merrill* and *Jones* to be irreconcilable, but that the decision in *Merrill* "better comports with the text and purpose of Rule 404(b)." *Id.* at 1040. The court noted that Rule 404(b) is a rule of inclusion, not exclusion, and that since *Huddleston v. United States*, 485 U.S. 681 (1988), the threshold for the first prong of the four-part test is that the government "lay a factual foundation from which a jury could reasonably conclude that the defendant committed the allegedly-similar bad acts." *Id.* at 1040. The Ninth Circuit held that,

> "uncharged prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions

14

were issued outside the usual course of professional practice and without a legitimate medical purpose. Lague's practice-wide evidence was therefore probative of his unlawful intent." . . . "Because the prescription data made the intent element of the section 841 charges more probable, the district court properly admitted Lague's uncharged prescriptions under Rule 404(b)."

*Lague* at 1040.

## IV. Request for Admission of Certain Evidence under Rule 404(b)

In the present case, the United States requests to admit the following evidence under Rule 404(b) as evidence of intent, knowledge, and absence of mistake: a) additional prescriptions issued to defendant's patients whose prescriptions are charged in Counts 1 through 9 of the Superseding Indictment, b) testimony from defendant's patients who are not covered in Counts 1 through 9 of the Superseding Indictment, and c) practice-wide evidence that during the timeframe charged in the Superseding Indictment, defendant issued certain kinds of prescriptions in enormous quantities and dangerous combinations outside the standard of medical practice generally recognized and accepted in the country.

### A. *Additional Prescriptions of Patients in the Indictment*

In this case, the United States seeks to admit under Rule 404(b) uncharged prescriptions relating to the nine patients covered by the charges in the indictment. This evidence is the same type of evidence admitted under Rule 404(b) in *Katz* and affirmed by the Eight Circuit. *See Katz* at 1029. The United States will present the original prescriptions from pharmacies that filled the prescriptions for each patient. The prescriptions will be offered in connection with testimony from an expert who reviewed each of the patients' medical records obtained from PARKER's office during a search warrant in October 2019. The prescriptions are similar in kind and close in time to the crimes charged and are shown by a preponderance of the evidence to be prescriptions issued by PARKER. As in *Katz*, PARKER's intent in writing the charged prescriptions is central to the

case and relevant to a material issue. The admission of the uncharged prescriptions and expert medical evaluation of PARKER's treatment of each of the nine patients is not unfairly prejudicial and has probative value to the jury.

    B.    *Testimony from Patients who are not Covered in Counts of the Superseding Indictment*

The United States seeks to admit under Rule 404(b) testimony from patients who are not the subject of specific counts in the Superseding Indictment. Some of those patients' statements are outlined above. In *Katz*, the United States offered similar testimony of a patient whose prescriptions were not included in the indictment under Rule 404(b), and its admission was affirmed by the Eighth Circuit. *See Katz* at 1030; *see also United States v. Ali*, 161 F.3d 745, 573 (8th Cir. 2010) (affirming the admission of witness testimony under 404(b)). The patients' testimony is offered to show PARKER's knowledge that he was operating outside the scope of professional practice and intended to do so. *See United States v. Chaney*, 921 F.3d 572, 591 (6th Cir. 2019) (explaining, "[e]vidence of the circumstances surrounding issuance of prescriptions allows juries to infer that a physician's purpose was something other that legitimate medical treatment"). Prior to trial, the United States will provide the Court and the defense a more complete description of which patients will be called as witnesses and the substance of their testimony.

    C.    *Practice-Wide Evidence Showing the Defendant Operated Outside the Standard of Medical Practice Generally Accepted Throughout the Country*

The United States seeks to admit under Rule 404(b) Arkansas Prescription Monitoring Program (PMP) data for an approximate two-year period showing that PARKER prescribed outside the bounds of legitimate medical practice. This type of evidence was found admissible under Rule 404(b) by the Ninth Circuit in *United States v. Lague* and the Eleventh Circuit in *United States v. Merrill*. *Ibid.*

This type of extrinsic evidence is not the subject of discussion in *United States v. Jones* or *United States v. Katz*[3]. *Ibid.* In *Jones*, the Eighth Circuit found inadmissible 478 prescriptions not relating to specific counts of the indictment where the United States failed to offer any proof of a doctor-patient relationship or "present other proof that the prescriptions had not been issued for a proper medical purpose." *Jones* at 768. In *Jones*, the court found that the quantity of prescriptions without any other context could lead the jury to speculate that the prescriptions had been issued for a wrongful purpose, and that this evidence was not probative of the transactions charged in the indictment. *Jones* at 768-69.

However, the practice-wide data in this case is offered as evidence that PARKER's overall prescribing regime was outside the scope of legitimate medical practice. This evidence is relevant and probative to show that PARKER intended to issue the charged prescriptions outside the course of legitimate medical practice, that he knew they were unlawful, and that his unlawful prescribing of the charged prescriptions was not mistake or accident. First, the quantity of prescriptions is but one factor. Other factors are PARKER's prescribing practice for opioid medications in comparison to other doctors engaged in general practice, to doctors who engage in pain specialty practice, and to opioid prescribing throughout the State of Arkansas. Another factor is PARKER's prescribing practice compared to CDC Guidelines[4] and State Guidelines[5] for opioid prescribing. The practice-wide data analysis of PARKER's prescribing in 2018 and 2019 is offered in conjunction with expert testimony about state and national prescribing guidelines based on generally accepted

---

[3] Prescriptions outside those of patients covered by the indictment were not part of the *Katz* analysis.
[4] In 2016, the Centers for Disease Control (CDC) published detailed recommendations for primary care clinicians prescribing opioids for chronic pain. These Guidelines well known in the medical community, and are readily accessible, even to the public.
[5] As of August 8, 2018, Regulation No. 2 of the Arkansas Medical Practices Act prohibits the "prescribing of excessive amounts of controlled substances to a patient including the writing of an excessive number of prescriptions for an addicting or potentially harmful drug to a patient. 'Excessive' is defined as the writing of any prescription in any amount without a detailed medical justification for the prescription documented in the patient record."

medical standards. The fact that PARKER well exceeded norms for opioid prescribing in the medical community is evidence that PARKER did not intend to act in the usual course of professional practice when he issued the charged prescriptions. The practice-wide evidence is probative of PARKER's unlawful intent to issue the charged prescriptions, and it is not unfairly prejudicial. Therefore, its admission is proper under 404(b).

WHEREFORE, the United States requests that the Court issue a pretrial ruling on the admissibility of 404(b) evidence in advance of trial.

DAVID CLAY FOWLKES
FIRST ASSISTANT UNITED STATES ATTORNEY

By: /s/ Anne E. Gardner

ANNE E. GARDNER
Special Assistant United States Attorney
P.O. Box 1229
Little Rock, Arkansas 72203
(501) 340-2600
Anne.Gardner2@usdoj.gov
