UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 4:19CR40018 SOH |
| | ) | |
| LONNIE JOSEPH PARKER | ) | |

**THE UNITED STATES OF AMERICA'S
SUPPLEMENTAL NOTICE OF INTENT TO OFFER RULE 404(b) EVIDENCE AND
MOTION FOR ADMISSION OF EVIDENCE UNDER 404(b)**

The United States of America, by David Clay Fowlkes, First Assistant United States Attorney for the Western District of Arkansas, and Special Assistant United States Attorney Anne E. Gardner, submits the following response in to defendant's motion for disclosure of F.R.E. 404(b) evidence (*Doc. No. 37*), and defendant's Response to Rule 404(b) Notice (*Doc. No. 40*).

**BACKGROUND**

The United States provided notice of its intent to seek the admission the following evidence under Federal Rules of Evidence, Rule 404(b) (Rule 404(b)) as evidence of intent, knowledge, and absence of mistake: a) additional prescriptions issued to defendant's patients whose prescriptions are charged in Counts 1 through 9 of the Superseding Indictment, b) testimony from defendant's patients who are not covered in Counts 1 through 9 of the Superseding Indictment, and c) practice-wide evidence that during the timeframe charged in the Superseding Indictment, defendant issued certain kinds of prescriptions in enormous quantities and dangerous combinations outside the standard of medical practice generally recognized and accepted in the country.

In the defendant's response, he did not object to the admission of additional prescriptions issued to defendant's patients whose prescriptions are charged in Counts 1 through 9 of the Superseding Indictment. The defendant requested additional facts regarding testimony from

defendant's patients who are not covered in Counts 1 through 9 of the Superseding Indictment, and requested an expert report regarding practice-wide evidence during the timeframe charged in the Superseding Indictment. At this time, the United States outlines the anticipated patient witness testimony, however, the finalized expert report has not been received. Therefore, the United States seeks a pre-trial ruling on subpart "b)", testimony from defendant's patients who are not covered in Counts 1 through 9 of the Superseding Indictment.

*Testimony from Patients who are not Covered in Counts of the Superseding Indictment*

The United States seeks to admit under Rule 404(b) as evidence of knowledge, intent, and absence of mistake testimony from patients who are not the subject of specific counts in the Superseding Indictment as evidence that Dr. Parker was operating a "pill mill" in which he was prescribing controlled substances without legitimate medical purpose. "Pill mills" have been found to have common characteristics, including some or all of the following: clinics 1) are cash only and do not accept medical insurance, 2) provide no variation in treatment by prescribing each patient the same or substantially similar narcotic or narcotics in same or similar quantities, 3) prescribe "a trinity" of drugs including a narcotic, benzodiazepine/depressant combined with a non-controlled substance, such as an antibiotic or muscle relaxant, 4) prescribe specific narcotics as requested by patients, 5) provide little or no medical examination, 6) possess no medical equipment or equipment that is not operational, 7) serve a large number of patients per day, 8) make no recommendations to patients for alternative therapy or future treatment such as X-rays and physical therapy, 9) direct patients to fill prescriptions at certain pharmacies, 10) have patients who travel from long distances for treatment and/or travel in groups to the clinic, 11) see majority of patients without an appointment, and 12) employ armed security guards. *See e.g., United States v. King*, 898 F.3d 797, 803 (8th Cir. 2018); *United States v. Gowder*, Slip Copy 2020 WL 7863139

\*2 (6th Cir. December 30, 2020); *United States v. Azmat*, 805 F.3d 1018, 1036-37 (11th Cir. 2015). In *Katz*, the United States offered similar testimony of a patient whose prescriptions were not included in the indictment under Rule 404(b), and its admission was affirmed by the Eighth Circuit. *See United States v. Katz*, 445 F.3d 1023, 1030 (8th Cir. 2006); *see also United States v. Ali*, 161 F.3d 745, 573 (8th Cir. 2010) (affirming the admission of witness testimony under 404(b)). The patients' testimony is offered to show Dr. Parker's knowledge that he was operating outside the scope of professional practice and intended to do so. *See United States v. Chaney*, 921 F.3d 572, 591 (6th Cir. 2019) (explaining, "[e]vidence of the circumstances surrounding issuance of prescriptions allows juries to infer that a physician's purpose was something other than legitimate medical treatment").

The defendant has been provided summaries of interview for the following patients that contain each patient witness' identity. The United States requests to offer the following testimony under Rule 404(b):

1. **Patient Witness TH:**

TH has been a patient of Dr. Parker since 2017. She began seeing him when she was in the hospital getting tumors removed from her breast. Dr. Parker was doing rounds in the hospital where she was a patient. After she was discharged, Dr. Goins gave her a referral to see Dr. Parker at his clinic. TH has had pain issues since her surgery and suffers from epilepsy. She saw Dr. Parker once a month for pain. When TH first went to Dr. Parker, she brought her medical records for him to review, and she was examined. After the first visit, Harris did not receive a medical exam.

Harris described a typical visit as a several hour wait in the office followed by a drug test. After the drug test, she either saw Dr. Parker or a nurse practitioner. Dr. Parker or the nurse would talk to her and give her the prescriptions that she wanted. TH is on Medicaid. When she first began

seeing Dr. Parker, Medicaid paid for her visits. TH had to pay a $30 co-pay. At some point, Dr. Parker stopped taking Medicaid, and the cost of TH's appointments increased from $30 to $175. Soon after, Dr. Parker brought in a counselor. When TH was required to see the counselor, she paid an additional $175. All of the fees were paid in cash. TH paid because she knew she was guaranteed to get her pain medicine prescriptions.

Conversely, TH was able to use her insurance to pay for her prescriptions. She usually went to Walgreens in Hope, Arkansas. Dr. Parker had an auto-refill system set up with them. TH drug tests were also charged to her insurance. Her samples were sent to a company called Labcorp. In December 2018, TH received a notice that her drug test was not being covered any more. The notice stated that she had an outstanding balance of a few thousand dollars. TH believed that the workers in Dr. Parker's office coded the drug screening incorrectly. TH did not worry about the outstanding debt. Eventually, TH stopped going to Dr. Parker, because the prices kept going up, and she simply could not afford to go any longer.

TH thought Dr. Parker was a good doctor until he moved to Texarkana, Arkansas. Then, it seemed like there were many people going to Dr. Parker to get pain pill prescriptions. People were willing to drive long distances and wait for hours to get their prescriptions. Dr. Parker was known around town as "Dr. Feelgood". To TH, the majority of patients seemed like they were the type of people who would sell the prescriptions. Kevin LNU (Last Name Unknown) worked the front desk at Dr. Parker's office. He often had to put people out of the office because they were getting angry waiting so long for an appointment, and they were disruptive. Finally, Dr. Parker put a television in the waiting room. The television seemed to help to calm people down. Dr. Parker's clientele was a younger group, most patients appearing to be in their twenties or thirties. They packed into Dr. Parker's waiting room trying to get pain medicine prescriptions. TH explained that if she was

still waiting at the end of the day, she was just given her prescription, as the staff just wanted to go home. The staff would ask everyone in the waiting room what they needed, and then they would pass out prescriptions. TH witnessed people talking about sharing and buying each other's pills. TH was approached in the parking lot about selling her pills. She was offered $300 to $500 to sell her prescription. TH refused. TH received pills from Dr. Parker for about three years. Dr. Parker wrote her prescriptions for hydrocodone and Xanax. One time, she also had oxycodone in her urine when she was drug tested. Dr. Parker made her see the counselor. The counselor told her that the next time something came up in her urine, she would be unable to get her prescriptions until she had two clean drug screenings. TH explained that his statement was a joke because the two tests could be done back to back on the same day. Furthermore, TH stated that she routinely had marijuana in her system when she was drug tested, and it was never mentioned. Plus, if a patient told the nurse that he/she could not urinate, he/she still got a prescription. There was also an Arab looking man who worked in the office. He kept people in control and made sure everyone paid in full before they received their prescriptions.

TH stated that there was a man in Dr. Parker's office that sold CBD oil and products. He would let people try them for free and then charge between $50 to $70 for the products. A lot of people bought CBD products. TH started to go to St. Michael's when she could no longer afford to go to Dr. Parker's office. The doctor she saw there asked her if she knew she was about to die. He explained that the combination of medicines that she was taking along with the medical problems she had was a lethal combination. The doctor has since gotten TH on a different regimen.

2. **Patient Witness JJ:**

JJ stated that his first appointment lasted approximately thirty (30) minutes. Dr. Parker examined his leg the first time and asked JJ to provide a pain level. Dr. Parker prescribed

Hydrocodone 10-325mg and Tramadol 50MG. Typically, JJ would pay between $125-150 for his visits. A drug test was administered during each visit, but no one watched the patients complete the drug test. JJ advised on multiple occasions, he failed his drug test, and that he had cocaine and methamphetamine in his system on two separate occasions. JJ said he would have to go see "Mr. Walker" if he failed his test. Mr. Walker would "evaluate" the patients that failed the test and advise Dr. Parker if they were able to receive prescriptions or not. JJ said he routinely tested positive for marijuana on his drug test. Dr. Parker and Mr. Walker told JJ that marijuana was basically legal in Arkansas, and he did not have to worry about testing positive for it.

JJ said he would only see Dr. Parker once every three months. The following month after seeing Dr. Parker, JJ would see the nurse practitioner, Laterica House. JJ believed that House already had a pre-written prescription before the visit, because once he was able to get in to see House, the visit was not long, and she would hand him a prescription without checking him out. The following month, JJ met with Mr. Walker, who would evaluate him to see if he was using narcotics or abusing his prescriptions. JJ advised he would receive a prescription after his visit with Mr. Walker from Dr. Parker.

JJ believed that if he would've taken his medical records to a different doctor that he would not have been prescribed the same prescriptions. JJ advised a guy named Mr. Saad, who has been identified as Saad Dawalibi, sold CBD oil in the back of the clinic. He said he sold it for $25 a cartridge and $50 for CBD cream.

3. **Patient Witness JS:**

JS advised she has had neck and back pain from a wreck. She took an X-ray from the accident into Dr. Parker's office for her first appointment. She was not referred to Dr. Parker, but

all she had to do was call and schedule an appointment. JS was asked to talk about her first appointment with Dr. Parker. She advised every time she has gone to see Dr. Parker the wait has been all day to see him. The first time she went into the clinic, she had to fill out a questionnaire, and she brought her previous medical records. JS said there was never an examination, she would only talk to Dr. Parker, and he would give her prescriptions. She would also see a counselor named Walker (first name unknown) and the nurse practitioner named Laterica House. JS said when she would see the nurse practitioner or counselor, the prescriptions for her were already written out. JS advised she thought it was weird, and she didn't like how she was billed from her insurance company for seeing the doctor when she only saw the nurse practitioner and the counselor. JS said after a year of her insurance paying to see Dr. Parker, they advised they would not pay for her to see him. JS began paying cash every visit to see Dr. Parker. JS would pay $250 every visit and would go to an appointment every month. JS advised most of the patients at the clinic looked like "dope fiends." JS made Dr. Parker's office change the time of her appointment so she wouldn't have to sit with the "dope fiends" in the lobby. JS advised she will not go back and see Dr. Parker if the clinic reopens, and she has found a new pain management specialist in Texarkana, AR.

4. **Patient Witness DA:**

DA told investigators that he has been a patient of Dr. Parker since May 2017 and was informed that Dr. Parker's clinic was shut down when he presented for his scheduled appointment on June 15, 2019. According to DA, he was referred by "Healthcare Express" and was being treated by Dr. Parker for pain management following several surgeries in March 2017 on his foot due to a condition that causes his bones to deteriorate. DA stated that it took approximately one month to get his first visit with Dr. Parker after providing a referral and all his previous medical records.

DA told investigators that the first appointment consisted of several "tests", an exam, and X-rays. Following this, he was put on a rotation where he would see Dr. Parker one month, the nurse practitioner "Ms. House" one month, and a counselor the following month. He stated that originally it was $150 cash for the visit to Dr. Parker and $75 for the visits with Ms. House and the counselor, but that it was now $150 cash for each visit. DA stated that the visits were billed to Medicaid as well as being charged cash per visit, but he did not think Medicaid paid out for the visits.

When questioned by investigators as to what kinds of tests were conducted by Dr. Parker, DA stated that at every visit a urine screen was conducted, and that every six months a blood test was conducted. After the urine and/or blood tests were conducted, vital signs were taken and DA was sent back to the lobby to wait for his appointment, which according to him took several hours. While sitting in the lobby, DA stated that he observed other patients "complaining about not getting the pills they wanted," and that there were "lots of patients coming in and out." Dr. Parker prescribed him oxycodone, hydrocodone, and muscle relaxers, and Dr. Parker tried to lower his dosage of medications after "DEA changed the rules." DA also stated that he believed Dr. Parker had the prescriptions "pre-written" for the visits with the other providers, and that you were only given them after completing your visit and doing your urine/blood tests.

[this space intentionally blank]

WHEREFORE, the United States requests that the Court issue a pretrial ruling on the admissibility of the above described witness testimony as 404(b) evidence.

                                      DAVID CLAY FOWLKES
                                      FIRST ASSISTANT UNITED STATES ATTORNEY

                                  By: /s/ Anne E. Gardner

                                      ANNE E. GARDNER
                                      Special Assistant United States Attorney
                                      P.O. Box 1229
                                      Little Rock, Arkansas 72203
                                      (501) 340-2600
                                      Anne.Gardner2@usdoj.gov