IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

UNITED STATES OF AMERICA                       PLAINTIFF

v.                   4:19CR40018 SOH

LONNIE JOSEPH PARKER               DEFENDANT

<u>MOTION FOR NEW TRIAL</u>

Comes Dr. Lonnie Joseph Parker, through his attorneys, Jeff Rosenzweig and Drake Mann, and for his Motion for New Trial states:

**INTRODUCTION AND SUMMARY**

1. Lonnie Joseph Parker seeks a new trial under authority of Rule 33 of the Federal Rules of Criminal Procedure.   The basis for grant of a new trial is because of the issuance of revisions of Centers for Disease Control and Prevention (CDC) CLINICAL PRACTICE GUIDELINE FOR PRESCRIBING OPIOIDS FOR PAIN — UNITED STATES, 2022 (CDC Guidelines) after the trial in this matter.   In the 2022 revision of the Guidelines, **<u>issued one week after Parker's trial concluded</u>**,   the CDC endorsed the position which Parker took at trial — and which the government contested —  that proper medical practice permitted the physician discretion in  the prescription of opioids.   This new evidence is not merely cumulative or impeaching.

1

It is not only material to the issues involved.  Indeed,  it is crucial to the issues involved.   The new Guidelines vindicate the position Parker adduced at trial and which the government scoffed at.    Moreover, it is probable that the new evidence would have produced an acquittal at trial had it been available and it is probable that it will produce an acquittal if presented at a new trial.   The 2022 Guidelines are Exhibit 1 to this motion.

## BACKGROUND

2.  The CDC first released its GUIDELINES FOR PRESCRIBING OPIOIDS FOR PAIN in 2016.   The 2016 Guidelines are Exhibit 2  to this motion.

3.  Almost immediately, state medical boards and legislatures across the country began writing concrete laws and regulations modeled after the 2016 CDC Guidelines to address what had widely become known as "the opioid crisis." Arkansas was one such state. See discussion of Shelli Chupik's testimony  below.

4.  Within three years, however, the principal authors of the 2016 CDC Guidelines recognized there was a problem in interpretation and application of the Guidelines:

> Efforts to implement prescribing recommendations to reduce opioid-related harms are laudable. Unfortunately, some policies and practices purportedly derived from the guideline have in fact been inconsistent with, and often go

2

beyond, its recommendations. A consensus panel has highlighted these inconsistencies, which include inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice.

Deborah Dowell, M.D., M.P.H., Tamara Haegerich, Ph.D., and Roger Chou, M.D. No Shortcuts to Safer Opioid Prescribing, N Engl J Med 2019; 380:2285-2287 DOI: 10.1056/NEJMp1904190 (June 13, 2019).

5.  The Arkansas State Medical Board made exactly the mistake the authors of the 2016 CDC Guidelines identified in 2019—possibly worse: it converted guidelines into law.  And the government built its case against Dr. Parker with that law—it opened with it and emphasized it throughout.

6.  The crux of this prosecution  is whether Dr. Parker's prescriptions were "authorized"—that is, whether they were written for a legitimate medical purpose in the usual course of professional practice.   "[A]uthorization plays a 'crucial' role in separating innocent conduct—and, in the case of doctors, socially beneficial conduct—from wrongful conduct." *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022).

7. In *Ruan*  the  Supreme Court recognized the nearly impossible challenge a jury faces in separating the socially beneficial conduct of authorized prescriptions

from criminal conduct:

> In addition, the regulatory language defining an authorized prescription is, we have said, "ambiguous," written in "generalit[ies], susceptible to more precise definition and open to varying constructions." *Gonzales v. Oregon*, 546 U. S. 243, 258, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006); see id., at 257, 126 S. Ct. 904, 163 L. Ed. 2d 748 (regulation "gives little or no instruction on" major questions); see also 21 CFR §1306.04(a) (regulation defining "effective" prescription as one "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice"). The conduct prohibited by such language (issuing invalid prescriptions) is thus "often difficult to distinguish from the gray zone of socially acceptable . . . conduct" (issuing valid prescriptions). *United States Gypsum*, 438 U. S., at 441, 98 S. Ct. 2864, 57 L. Ed. 2d 854.

142 S. Ct. 2370, 2377-78 (2022).

8.  In the face of these "ambiguous" guideposts the government obscured what prescribing was socially beneficial by citing the morphine milligram equivalent dosage "limits" derived from 2016 CDC Guidelines and promulgated into law in the Regulations of the Arkansas State Medical Board.   Therefore, the government presented these as the   standard of medical care in the state. The jury would have understood evidence that Dr. Parker was prescribing to the charged patients in excess of these MME dosage limits as evidence that Dr. Parker's prescription practice was "unauthorized."

4

## HOW THE 2016 GUIDELINES WERE USED AT TRIAL

9.  In its opening statement the government repeatedly stated its case against Dr. Parker saying his prescriptions were not within the "standard of care in Arkansas." It then framed the line it said Dr. Parker crossed with repeated and sustained references to the federal CDC Guidelines, first through the testimony of Little Rock DEA diversion squad agent Shelli Chupik and later with the expert testimony of a physician (ironically from Florida), Mark Rubenstein.

10.  Ms. Chupik, testified in detail about the 2016 CDC Guidelines, the Guidelines' specification of limits in MME's (morphine milligram equivalents), and supposedly why those limits were important.

11.  Ms. Chupik then testified about the Regulations of the Arkansas State Medical Board, specifically, Regulation 2.4. Ms. Chupik pointed out the Board made changes to Regulation 2.4 in 2016. The government showed the jury the 2016 Regulations before 2016, Government Exhibit 1, and then it showed the jury the amended Regulation 2.4, Exhibit 1a.   These are included here as Exhibits 3 and 4 to this motion.

12. In testifying about the amendments, Ms. Chupik highlighted the fact that the amended Regulation 2.4 expressly incorporated the 2016 CDC Guidelines, including the 2016 Guidelines specific MME dosage limits. See p. 2 of Gov't Ex. 1a.

5

13.   Both Ms. Chupik and Dr. Rubenstein specifically cited the 50 MME dosage    appearing in the 2016 CDC Guidelines and in Regulation 2.4(A)(b) ("Chronic Pain: If there is documented medical justification, 'excessive' is defined pursuant to the Centers For Disease Control (CDC) guideline for prescribing opioids for chronic pain, as prescribing  opioids at a level that exceeds   50 Morphine Milligram Equivalents (MME) per day, unless the physician/physician assistant documents each of the following . . .")

14. Dr. Rubenstein highlighted the 2016 CDC Guidelines during his testimony on the development and history of the "opioid crisis." He particularly cited the > 90 MME dosage cited by both Regulation 2.4 and the 2016 CDC Guidelines. The amended Regulation 2.4 mentions both the 50 MME and 90 MME dosage limits, just as the 2016 CDC Guidelines mention them. Ark. Med. Bd. Regulation 2.4.C. ("When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to > 50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to > 90 MME/day or carefully justify a decision to tritrate [sic] dosage to > 90 MME/day.")

15.   What both Ms. Chupik and Dr. Rubenstein did not make clear is why the

Regulation and 2016 Guidelines have two MME figures (50 MMEs and 90 MMEs) or what the difference is between them. Instead of guiding the jury through this gray zone of ambiguous regulations, the government witnesses obscured key facts, such as that Regulation 2.4.C. addresses itself to the framework of "when opioids are started," without directly noting that Dr. Parker did not start any of his patients on opioids.

16.  On the contrary, when asked about patients who come to him already on high doses of opioids, Dr. Rubenstein said he had to decide if he even wants to see the patient.   Among his other comments about MMEs, Dr. Rubenstein noted that Noel Crabtree was taking 240 MMEs/day. Similar remarks Dr. Rubenstein made about Dr. Parker's MME-related prescribing included Dr. Rubenstein's observation that Dr. Parker stated in his plan of care that he would reduce Mr. Crabtree's MMEs. But, Dr. Rubenstein testified with an overtone of wrongdoing, Dr. Parker never did so.

17.  The jury has expressed through its verdict how it judged that testimony and those exhibits.

18.  Dr. Parker repeatedly attempted to put the 2016 CDC Guidelines in context. First, his cross-examination of Ms. Chupik highlighted the contradictory features of her testimony.   Ms. Chupik had implied the MMEs were limits that

should not be crossed,  but Regulation 2.4's explicit emphasis was on documenting the medical justification of prescribing above the 50 MME and 90 MME 2016 CDC Guideline levels. And Ms. Chupik never cogently explained how there could be two different limits.

19.  Second, Dr. Parker got Dr. Rubenstein to acknowledge that the authors of the 2016 CDC Guidelines had attempted to raise red flags about the misuse of the 2016 CDC Guidelines in their 2019 the New England Journal of Medicine Perspective.

20.  But these contradictions could only have served to confuse the jury.  They certainly caused confusion among lawmakers. In March of 2022, when it seemed likely the CDC would issue new guidelines and that the new guidelines would show how the 2016 Guidelines had been misused, thought leaders across the country noted resistance to the idea. For example, in STATES LIKELY TO RESIST CDC PROPOSAL EASING OPIOID ACCESS, author Christine Vestal, writing for the non-partisan, evidence-based Pew Charitable Trusts, succinctly set out the problem:

> Those initial CDC guidelines recommended that doctors limit initial prescriptions of opioid painkillers to no more than a week and set a maximum daily dose that is roughly equal to 90 mg of morphine.
> Rather than limiting the number and strength of painkillers physicians can prescribe, the new guidelines would give doctors wide discretion to weigh the benefits of

pain relief and improved physical function against the
known risks of opioid painkillers.

21.    She then further illustrated the problem in the words of various medical
community leaders. "'The old language was a real problem,' Mukkamala said. 'When
it got down to states and individual insurers and health systems it became dogma, it
became gospel. It really left patients in a bad position.'" "'Relaxing those regulations
now would wreak havoc on states. They won't know what to do,' said Dr. Gary
Franklin."   This article is Exhibit 5 to this motion.

22.    But, at the time of Dr. Parker's trial, because the CDC had not yet issued
amendments to 2016 CDC Guidelines, Dr. Parker could only argue that they were
controversial.

23.    The 2022 Guidelines were released the week after Parker's trial
concluded.   These Guidelines definitively established that the evidence the
government adduced as proof that Dr. Parker was a criminal was, instead, proof that
Dr. Parker was writing lawful, socially beneficial prescriptions.   For example, the
government showed Dr. Parker prescribed the charged prescriptions and overdose
medicine at the same time—as if there were something sinister about his doing so.
And yet, the 2022 CDC Guidelines recommend exactly that:

Offering Naloxone to Patients
       Naloxone is an opioid antagonist that can reverse

9

severe respiratory depression; its administration by laypersons, such as friends, family, and caregivers of persons who experience opioid overdose, can save lives (293). Naloxone precipitates acute withdrawal among patients physically dependent on opioids. Serious adverse effects (e.g., pulmonary edema, cardiovascular instability, and seizures) have been reported but are rare at doses consistent with labeled use for opioid overdose (294). The clinical evidence reviews identified one observational study (295) that found provision of naloxone to patients prescribed opioids in primary care clinics was associated with decreased likelihood of opioid-related emergency department visits (7).

Clinicians should offer naloxone when prescribing opioids, particularly to patients at increased risk for overdose, including patients with a history of overdose, patients with a history of substance use disorder, patients taking benzodiazepines with opioids (see Recommendation 11), patients at risk for returning to a high dose to which they have lost tolerance (e.g., patients undergoing tapering or recently released from prison), and patients taking higher dosages of opioids ( 50 MME/day).

(P. 48, 2022 Guidelines)

25.   Other examples include that the government's second witness, DEA case agent Maggie Purcell, showed the jury photograph after photograph of toxicological drug tests showing "INCONSISTENT" drug results—none of which involved the charged counts.   Later, the government had Dr. Rubenstein point out several instances in which the charged patients had "failed" drug screens, yet Dr. Parker continued to prescribe for them—again, insinuating misconduct by Dr. Parker.   But the 2022 CDC Guidelines specifically recommend "Toxicology testing should not be

used in a punitive manner but should be used in the context of other clinical information to inform and improve patient care.  Clinicians should not dismiss patients from care on the basis of a toxicology test result. Dismissal could have adverse consequences for patient safety, potentially including the patient obtaining opioids or other drugs from alternative sources and the clinician missing opportunities to facilitate treatment for substance use disorder."  Recommendation 9. (P. 48, 2022 Guidelines)

26.  Although it never developed the point beyond insinuation, the government accented testimony regarding the actual or possible opioid addiction, abuse, or misuse histories of Noel Crabtree, Luke Holley, and Josh Franklin.   Crabtree's family testified about their concerns. Dr. Rubenstein's testimony suggested Holley's request for hydrocodone instead of methadone   represented addictive behavior that Dr. Parker was supporting. Both Shelli Chupik and Dr. Rubenstein testified about the abuse potential of opioid therapy.  And  Franklin explicitly testified he had been addicted to the opioids   Dr. Parker had prescribed; his withdrawal, forced on him after Dr. Parker was arrested and no other doctors would continue his treatment regimen, was presented as a desirable success. Testimony that Dr. Parker continued treating patients despite inconsistent drug screens was presented without context. The combined effect of this testimony was to imply Dr. Parker's prescriptions to these

patients were criminal. Even if we posit that these patients had a diagnosed substance abuse disorder, they would still be entitled to opioid treatment and discontinuing opioid therapy. The 2016 CDC Guidelines mask this conclusion (p. 28-32) and, by offering little guidance beyond recommending treatment, imply patients with substance use disorders should not receive opioids. But the 2022 CDC Guidelines expressly discourage detoxification without providing medications to treat opioid use disorder. See Recommendation 12 (P. 54 et seq)  And the 2022 Guidelines expressly state: "Clinicians should not dismiss  patients from their practice because of opioid use disorder because this can adversely affect patient safety." (P. 56)

**HOW THE 2022 GUIDELINES AFFECT THE EVIDENCE**

27 .  Parker now discusses the specific application of the 2022 Guidelines to the offenses of conviction:

28.   The  government  also  displayed  warnings  of concurrent opioid and benzodiazepine coadministration. The government alleged that this was essentially an absolute admonition against coadministration.   However, the  2022 Guidelines make clear that these   are merely warnings, subject to the doctor's medical decision making:

> In patients receiving opioids and benzodiazepines long term, clinicians should carefully weigh the benefits and risks  of  continuing  therapy  with  opioids  and

12

> benzodiazepines and discuss with patients and other
> members of the patient's care team.
> (2022 Guidelines p. 53).

29.    This is something Dr. Parker clearly did, as proven by the written warning to patients recorded in their charts, including the chart of Noel Crabtree. The government also failed to acknowledge that:

> In specific situations, benzodiazepines can be beneficial,
> and stopping benzodiazepines can be destabilizing.
> P. 53, 2022 Guidelines

30.  It is undisputed that Crabtree had been diagnosed with severe chronic pain by multiple medical professionals. Crabtree had been on high dose opiate medication therapy for about ten years prior to seeing Dr. Parker. The medications had been started after a workplace accident had caused severe injury to his back. Over those years Crabtree suffered through seven back surgeries. This was also not disputed at trial. Crabtree came to Dr. Parker on a much higher dose than 90 MME and had been stable on that dose until he suffered new injuries, just before first coming to Dr. Parker. Crabtree had suffered a crushed hand with partial traumatic amputation of the fifth digit of the right hand, a torn rotator cuff and neck injuries when his hand was caught in a heavy sliding door at the maximum-security facility where he worked as a prison guard. Crabtree suffered PTSD after his initial injury, and this became

severe after the new one.   Crabtree was on his way to see a spine surgeon in Plano, Texas, when he was arrested and put in jail.  The jail staff withheld all medications, despite  Crabtree  clearly  telling  them  about  his  medical  problems  and  need  for medications.  He became unresponsive after five hours in the jail, but no emergency services were called.  An hour after that EMS was called but it was too late, and he died.   Dr. Parker was acquitted of the causing death enhancement.

31.  The government through its expert witness, Dr. Rubenstein, argued that Mr. Crabtree had signs of addiction which should have resulted in his medications being stopped. The government, through Dr. Rubenstein, failed to acknowledge that once a patient has been on long-term opiate therapy, the cessation of this therapy itself can result in death, as proven in Crabtree's case. Dr. Parker's treatment of Mr. Crabtree would have been even more justified under the new Guidelines because the risk of opiate treatment cessation, a risk ignored by the government's argument through the opinions of its expert witness.  The  2022 Guidelines  are summarized at Ex. 1 p 1  as:

> This  guideline  provides  recommendations  for clinicians providing pain care, including those prescribing opioids, for outpatients aged >18 years. It updates the CDC Guideline  for  Prescribing  Opioids  for  Chronic  Pain - United States, 2016 (MMWR Recomm Rep 2016;65[No. RR-1]:1-49) and includes recommendations for managing

acute (duration of <1 month), subacute (duration of 1-3 months), and chronic (duration of >3 months) pain. The recommendations do not apply to pain related to sickle cell disease or cancer or to patients receiving palliative or end-of-life care. The guideline addresses the following four areas:

1) determining whether or not to initiate opioids for pain,
2) selecting opioids and determining opioid dosages,
3) deciding duration of initial opioid prescription and conducting follow-up, and
4) assessing risk and addressing potential harms of opioid use.

CDC developed the guideline using the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) framework. Recommendations are based on systematic reviews of the scientific evidence and reflect considerations of benefits and harms, patient and clinician values and preferences, and resource allocation. CDC obtained input from the Board of Scientific Counselors of the National Center for Injury Prevention and Control (a federally chartered advisory committee), the public, and peer reviewers. CDC recommends that persons with pain receive appropriate pain treatment, with careful consideration of the benefits and risks of all treatment options in the context of the patient's circumstances. Recommendations should not be applied as inflexible standards of care across patient populations. This clinical practice guideline is intended to improve communication between clinicians and patients about the benefits and risks of pain treatments, including opioid therapy; improve the effectiveness and safety of pain treatment; mitigate pain; improve function and quality of life for patients with pain; and reduce risks associated with opioid pain therapy, including opioid use disorder, overdose, and death.

32.  Further proof that the Guidelines support Dr. Parker's medical decisions,

which had been taught in advanced treatment courses since 2016, including the

admonition not to engage in "…the rigid application of opioid dosage thresholds…",

are clarified below.

> Of particular concern, some policies purportedly drawn
> from the 2016 CDC Opioid Prescribing Guideline have
> been notably inconsistent with it and have gone well
> beyond its clinical recommendations (6,66,67). Such
> misapplication includes extension to patient populations
> not covered in the 2016 CDC Opioid Prescribing Guideline
> (e.g., cancer and palliative care patients), rapid opioid
> tapers and abrupt discontinuation without collaboration
> with patients, rigid application of opioid dosage thresholds,
> application of the guideline's recommendations for opioid
> use for pain to medications for opioid use disorder
> treatment (previously referred to as medication assisted
> treatment), duration limits by insurers and pharmacies, and
> patient dismissal and abandonment (66-68). These actions
> are not consistent with the 2016 CDC Opioid Prescribing
> Guideline and have contributed to patient harm, including
> untreated and undertreated pain, serious withdrawal
> symptoms, worsening pain outcomes, psychological
> distress, overdose, and suicidal ideation and behavior
> (66-71).
>
> P. 3, 2022 Guidelines.

33.   The evaluation of the risks and benefits of opiate therapy is a matter of

medical judgement and should not be dictated to doctors by the DEA through

prosecution, and the CDC guidelines should not have been used against Dr. Parker

at trial.  As made clear by the 2022 guidelines.

> This voluntary clinical practice guideline provides recommendations only and is intended to support, not supplant, clinical judgment and individualized, person-centered decision-making. This clinical practice guideline should not be applied as inflexible standards of care across patient populations by health care professionals; health systems; pharmacies; third-party payers; or state, local, or federal organizations or entities."
>
> P, 6, 2022 Guidelines

34. Furthermore, the CDC made clear that the revised guidelines should not replace clinical judgment and individualized, patient-centered decision-making.

> This clinical practice guideline provides recommendations but does not replace clinical judgment and individualized, patient-centered decision-making. The recommendations are based on emerging evidence, including observational studies or randomized clinical trials with notable limitations; thus, they should be considered in the context of the clinician-patient relationship built on shared understanding and a whole-person approach that considers such factors as the patient's physical and psychological functioning, support needs, expected health outcomes and well-being, home environment, and home and work responsibilities. Flexibility for clinicians and patients is paramount when making patient-centered clinical treatment decisions.
>
> P. 4, 2022 Guidelines.

35. And furthermore states that while the guidelines are intended for primary care clinicians and other clinicians providing pain care for outpatients aged > 18 years with acute pain (duration of <1 month), subacute pain (duration of 1-3 months),

or chronic pain (duration of >3 months).  Crabtree suffered from all of these types

of pain during his time under Dr. Parker's care.  The CDC clarification goes on to

state that:

> (T)he clinical practice guideline is not a replacement for clinical judgment or individualized, person-centered care; intended to be applied as inflexible standards of care across patients or patient populations by health care professionals, health systems, pharmacies, third-party payers, or governmental jurisdictions or to lead to the rapid tapering or abrupt discontinuation of opioids for patients; a law, regulation, or policy that dictates clinical practice or as a substitute for Food and Drug Administration-approved labeling; applicable to management of pain related to sickle cell disease, management of cancer-related pain, or palliative care or end-of-life care; or focused on opioids prescribed for opioid use disorder.
>
> P. 7, 2022 Guidelines

36.  Again, the new Guidelines state that "In patients receiving opioids and

benzodiazepines long term, clinicians should carefully weigh the benefits and risks

of continuing therapy with opioids and benzodiazepines and discuss with patients and

other members of the patient's care team." (P. 53, 2022 Guidelines)

37.  This is something Dr. Parker clearly did, as proven by the written warning

to patients recorded in their charts, including the chart of Noel Crabtree.  The

government also failed to acknowledge that:

> In specific situations, benzodiazepines can be beneficial,

and stopping benzodiazepines can be destabilizing.
P. 53, 2022 Guidelines

38.   The New Guidelines further clarify that clinicians should carefully weigh both the benefits and risks of continuing opioid medications and the benefits and risks of tapering opioids.  (P. 33, 2022 Guidelines)

38.   Dr. Parker clearly did this as proven by his notes in the chart where he documents trying to reduce medications if the patient can tolerate it.   The government, through its expert witness, made the fallacious argument that, "if the doctor was worried about addiction, he must stop treatment", when in fact the new Guidelines recommend that, "If benefits outweigh risks of continued opioid therapy, clinicians should work closely with patients to optimize nonopioid therapies while continuing opioid therapy." (P. 33)    It goes on to further clarify that, "In situations where benefits and risks of continuing opioids are considered to be close or unclear, shared decision-making with patients is particularly important."  (P.33)

39.   Dr. Parker felt that in some patients where opioid tapers might be appropriate but they had been on long term high dose chronic opiate therapy, that tapering should be completed over several years.  This is supported by the New CDC Guidelines:

> Longer duration of previous opioid therapy might require
> a longer taper. For patients who have taken opioids

19

long-term (e.g., for 1 year), tapers can be completed over several months to years depending on the opioid dosage and should be individualized based on patient goals and concerns.

P. 53, 2022 Guidelines

40. The prescription Dr. Parker wrote on the one visit day in question, and every other prescription written, is supported by the 2022 Guidelines as a legitimate reason to continue prescribing.

41. The new Guidelines have equal impact on the J.H. count. This patient came to Dr. Parker after having been on opioids prescribed by government physicians at the Department of Veterans Affairs health system. The patient wanted to be able to continue employment operating machinery. The J.H. chart shows that Dr. Parker's treatment was consonant with the new Guidelines.

42. The issuance of the 2022 Guidelines also makes it highly likely that the jury would have acquitted Dr. Parker of the two misdemeanor cough medicine counts. The jury would have concluded that, having been vindicated on the more serious felony counts (and having been acquitted on two of the allegations) the cough medicine prescriptions also would have been issued in good faith.

## APPLICABLE LAW

43.  Rule 33 F.R.Crim.P provides:

(a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) Time to File.

(1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

(2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

44.  The Eighth Circuit's analysis of Rule 33 motions  is expressed in *United States v. Glinn*,  965 F.3d 940, 942 (8th Cir. 2020)

The district court may grant a new trial based on newly discovered evidence "if the interest of justice so requires." See Fed. R. Crim. P. 33(a). "Motions for a new trial based on newly discovered evidence are disfavored" and will generally be granted "only if the evidence was not discovered until after the trial; there was no lack of diligence by the movant; and the new evidence is material, more than merely cumulative or impeaching, and likely to produce an acquittal if a new trial is granted." United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001). The district

court has "broad discretion in deciding whether to hold an
evidentiary hearing on a motion for a new trial based on
newly discovered evidence." United States v. LaFuente,
991 F.2d 1406, 1409 (8th Cir. 1993). We will reverse the
court's ruling "only if we find a clear abuse of discretion."
Id. at 1408.

45.  The CDC guidelines are "evidence."  The government introduced various

statutes and regulations pertinent to the standards of medical practice.

46.  This  is "newly discovered evidence," since the evidence did not exist in

its current form— i.e. with a government imprimatur — at the time of the trial.

47.  Parker was diligent. He adduced cross-examination testimony at trial

concerning the controversy over the interpretation of the guidelines.

47.  The  new evidence is obviously material, since it deals with proper

standards of medical practice.

48.  The evidence is likely to produce an acquittal on at least the two remaining

felony counts, those dealing with the Crabtree. substantive count and the J.H. count.

In that regard, it clearly relevant that Parker was acquitted of two allegations, the J.F.

count and the enhancement of N.C.

49.  Moreover, the government cannot meritoriously argue that the fact that

Arkansas state regulations have not yet been amended affects the application of the

new Guidelines to this case.  By definition, *Ruan* announces a national standard of

care, as do the new Guidelines.

WHEREFORE, Parker prays that the Court conduct a hearing on this motion and grant a new trial.

LONNIE JOSEPH PARKER

JEFF ROSENZWEIG
Ark. Bar No. 77115
300 Spring St., Suite 310
Little Rock, AR 72201
(501) 372-5247
jrosenzweig@att.net

P. DRAKE MANN
Arkansas Bar Number 87108
Gill Ragon Owen, P.A.
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas 72201
Telephone: (501) 376-3800
E-mail: mann@gill-law.com